**Floyd A. MITLEIDER, Petitioner–Appellant,**

**v.**

**James HALL, Warden; Steven Cambra, Director; Bill Lockyer, Attorney General, Respondents–Appellees.**

No. 03–56097.

United States Court of Appeals, Ninth Circuit.

Submitted Nov. 4, 2004.*

Filed Dec. 10, 2004.

---

* This panel unanimously finds this case suitable for decision without oral argument. See

Fed. R.App. P. 34(a)(2).

Dorn G. Bishop, San Diego, CA, for the petitioner-appellant.

Bill Lockyer, Attorney General; Robert R. Anderson, Chief Assistant Attorney General; Gary W. Schons, Senior Assistant Attorney General; Gary W. Brozio, Supervising Deputy Attorney General; and Kevin R. Vienna, Deputy Attorney General, San Diego, CA, for the respondents-appellees.

Before: FERNANDEZ, SILVERMAN, and CALLAHAN, Circuit Judges.

CALLAHAN, Circuit Judge:

Floyd A. Mitleider appeals the district court's denial of his habeas corpus petition. Mitleider claims that race motivated the prosecutor's peremptory strike of four African–Americans from his jury in violation of the equal protection principles articulated in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). We have jurisdiction pursuant to 28 U.S.C. § 2253. The trial court followed the three steps set forth in *Batson* and determined that the prosecutor's reasons for the challenges were race-neutral. The trial court's determination was affirmed on appeal by the California Court of Appeal. As the state courts did not unreasonably apply clearly established federal law or unreasonably determine the facts in denying Mitleider's *Batson* challenge, we affirm.[1]

I.

In 1996, California charged Mitleider, who is not African–American, and three African–American co-defendants with solicitation to commit murder, conspiracy, and attempted murder based on events arising out of an alleged plot to kill Mitleider's wife in order to collect life insurance proceeds. The defendants were tried together in San Diego Superior Court.

The venire from which Mitleider's jury was drawn had one hundred members, but only five African–Americans. Voir dire was conducted on a model unit of eighteen prospective jurors at a time. Twelve jurors were identified to occupy the twelve juror seats, plus an additional six were placed "in the box."

The court conducted the initial voir dire on the original group of eighteen and then counsel for the parties were allowed to pose questions. After the court considered challenges for cause, counsel exercised peremptory challenges.

The opportunity for peremptory challenges occurred serially: first the prosecutor, then counsel for Mitleider's three co-defendants, and finally counsel for Mitleider. Individuals in the first twelve seats were subject to peremptory challenges. When a person was challenged, that person would depart and the seat would be filled, in order, from the additional six persons "in the box." When seven jurors had been challenged, thereby reducing the number of jurors to eleven, another seven persons were called so that there were again eighteen potential jurors, twelve in juror seats, and six "in the box." This system was used until twelve jurors and four alternates were sworn in.

The initial group of jurors seated in the jury box included two African–Americans, Miss W. and Mr. D. This group was passed for cause by all counsel. The prosecutor used his fourth peremptory challenge to excuse Mr. D. from the panel. Defense counsel did not object at the time. Mr. D. was the seventh prospective juror to be challenged, another seven prospective jurors were then called, and voir dire continued. In this round the prosecutor made two challenges before passing. When defense challenges dropped the remaining number of jurors to eleven, another seven jurors were called.

The prosecutor did not make any challenges for several rounds, and then used his seventh peremptory challenge to excuse Miss W. Defense counsel immediately requested a sidebar and the judge indicat-

---

**1.** We grant Mitleider's motion to supplement the record with the juror questionnaires for the four African–American jurors, the tran-

script of the voir dire proceedings, and the California Court of Appeal's unpublished opinion.

ed that he would give defense counsel an opportunity to make a record. Challenges continued and another group of seven jurors were called. This group included another African–American, Miss F., who moved into a jury seat at the end of the day.

Before jury selection resumed the next day, the trial judge offered defense counsel an opportunity to make a record of their *Wheeler/Batson* objection to the recusal of Miss W.[2] Defense counsel noted that only a very small percentage of minorities were on the jury venire, that the percentage of African–Americans in the community was higher than the percentage on the jury venire, and that three of the four defendants were African–American. The court asked the prosecutor if he wished to respond. He declined noting that he did not think that defendants had made a prima facie showing of a systematic pattern of exclusion. The court denied defendants' motion, but noted "I'm putting the prosecution on notice that the next Afro–American excused will require a recitation of reasons as to why the peremptories are being handled with respect to those individuals."

The prosecutor then indicated that he was challenging Miss F. In response to defense counsel's *Wheeler/Batson* objection, the prosecutor offered the following explanation for his challenges:

First of all, I'd like to say I never have and never will excuse a juror based on the color of their skin. I know these motions are almost always made. They're personally troubling, because it's not my personal practice nor my

professional practice to ever exclude anyone based on race, and I want to make sure that's very clear.

Of course, the things that I'm looking for in this case is whether jurors really want to serve, and whether they are going to be biased against the prosecution or against the defense, for that matter, and also whether intelligent and whether they have a broad life experience. All the three people that they have challenged had problems in these areas, and I challenged them for reasons that had to do with this.

Taking Mr. [D.], there were a number of things that concerned me about him. First of all, it appeared to me that he had limited life experience regarding his work. All that was written down on No. 21 in the questionnaire was that he was a recycling driver. I was unclear who he worked for, unclear if he had any other jobs. That concerned me. It was not the major concern, but it was a concern.

Another concern that I had was in regard to question No. 26 regarding whether he really wanted to serve, and he said, in effect, that he was reluctant to serve. He would if he had to, but he was reluctant. That concerned me.

My biggest concern revolved around question 46 and that was whether he had any family members that had any contacts with law enforcement that were negative or had been convicted of a crime, actually, and he told us that his brother—I believe he said he was in prison and was going to be paroled. It's slightly different from what he wrote on his questionnaire, but I think that's what

**2.** *People v. Wheeler,* 22 Cal.3d 258, 148 Cal. Rptr. 890, 583 P.2d 748 (1978), is the "California analogue" to *Batson,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69. As the aspects of the cases relevant to the case at bar are the same, and because we are reviewing Mitleid-er's petition for a writ of habeas corpus under 28 U.S.C. § 2254, we generally refer to *Batson* in analyzing his claims. *Collins v. Rice,* 365 F.3d 667, 674 n. 5 (9th Cir.2004), *petition for cert. filed,* 73 U.S.L.W. (U.S. July 7, 2004)(No. 04–52).

he told us in open court, and I'm very concerned about the bias that that might indicate towards the prosecution.

Also, when I was questioning in that regard, I didn't exactly like his body language. It didn't feel right to me. It felt a little defensive in that area.

An additional factor that concerned me as potential bias was No. 52 in his questionnaire where it's talking about whether a family member has been a party to a lawsuit, and it gives an answer that's somewhat confusing saying, "Rape charges were filed against a teacher's aide and lack of evidence, the case was dismissed." That seemed to indicate to me that there might be some bias against the prosecution because no case was filed or nothing done. It was, additionally, confusing.

For all those reasons I felt this was probably not the case for this juror to sit on.

Moving to Miss [W.], my basic concern with her was that she plainly did not want to be on this jury. She practically begged all of us not to put her on the jury. She said she'd be confused by the evidence. She said that she didn't want to be here over and over again, essentially.

Other than that, I thought she might have made a good juror, and if the Court would recall I passed and would have accepted her, except as we went through the challenges I looked at her and her face dropped and dropped and it was clear she didn't want to be here, and I didn't think she would give the case the attention it needed.

As the Court is going to be aware, this is probably going to be a fairly complex case in regard to the number of people involved, in regard to the jury instructions, and a person who thinks she may be confused or is saying that, in essence, to get off the case and not want to be here probably is not the right person for this jury.

Finally Miss [F.], I'm concerned about potential bias there. She said in her jury questionnaire—when asked if a family member, if anyone she knew had been convicted of a crime, she put down "probation problem." That was the extent of it. And then when I asked her questions she said her brother had this probation problem, and she told us at first that she believed he hadn't done anything wrong and then it came out that, in fact, he had been revoked. I believe she said he was in prison on a revocation.

That made me not only question her bias, but it made me question her credibility. I'm not sure she was telling the truth. At the very least, she did not sound like she knew what was happening, if that was the case. But it was very questionable and brought out potential bias, a potential credibility problem on her part.

Defense counsel declined to respond to the prosecutor's statement of reasons. The court then denied the *Batson* motion and Miss F. was excused.

The prospective jurors returned to the courtroom, and the clerk conducted a roll call. Miss B., an African–American juror, entered late. Counsel recommenced exercising their peremptory challenges and seven more jurors, including Miss B., were called to the box.

After passing several times and challenging another individual, the prosecutor used his eleventh challenge on Miss B. Defense counsel immediately requested a sidebar and, outside the jury's presence, moved for a mistrial on the basis of the prosecution's systematic removal of African–American jurors. In response, the

prosecutor offered the following explanation:

> Your Honor, of course the allegations—these allegations are upsetting to me and absolutely false, but I will respond to them.
>
> I think it's very obvious that Miss [B.] is very young, very immature. She practically has—she has very little life experience. She's not working right now. Apparently she hasn't worked for a year. She's just sitting at home, doing who knows what.
>
> She actually was late to the court by half an hour. That concerned me greatly. She was here—she walked in the doors at 9:30 when we almost started without her. That indicates to me a real maturity problem. This is the kind of case where someone like that shouldn't be sitting on the jury. It has nothing to do with race. It has to do with life experiences, maturity, and the ability to follow a complex case, complex jury instructions, and get along and discuss with others.

Defense counsel responded that the removal of all African–American jurors from the jury was a clear violation of *Wheeler*. The prosecutor replied:

> Your Honor, this is the problem with *Wheeler*. I think its intentions were very good, and its intention was to make sure that prosecutors and defense attorneys weren't kicking people off juries because of the color of their skin. But there are jury panels on occasion where a situation arises where there are very few of a certain minority, and the majority of those people of that minority are not individuals that one side or the other believe should be on the jury, not based on the color of their skin, but other factors.
>
> What the *Wheeler* decision says is that if you use a peremptory, you have to be able to explain why. There have to be reasons other than race that are good reasons, and in every one of these individual's cases there were very good reasons and they just happen to be black. That's the unfortunate part of it.
>
> But, once again, as far as Miss [B.], if the color of her skin was white, green, whatever, I still would not want her on this jury because of her age, because of her limited life experiences and because what appeared to me a lack of maturity, showing up to court at 9:30 when she had to be here at 9:00.

After a short recess, the court issued the following oral ruling:

> This is much closer than I would prefer to have, and my experience somewhat coincides with that represented by Mr. Rosenstock [one of the defense counsel], that in his years of practice, you usually don't get down to this other than to making a record.
>
> If I understand the holding in *Wheeler*, the discriminate part of this whole aspect of our system comes into play when there's a systematic exclusion of individuals, in this case Afro–Americans, based on race, gender and the like.
>
> We start out with the proposition in this case that there was, by agreement, a prescreening of the prospective panel to determine those who could sit for three to four weeks. It's pure speculation as to what the racial ingredient of that panel was. But I think we can say without question that a lot of the people who would otherwise be present for a case of two or three weeks in duration, in terms of race, are lost when we get around to three or four weeks.
>
> So we're sent a panel which apparently contains about five—and I haven't counted them—people of Afro–American racial background, and the prosecution has now challenged the fourth of those

potential five. There then has to be some reasonable explanation for the excuse of those jurors to avoid the appearance of a pattern of systematic exclusion.

The prosecutor has indicated that he has nothing personal in this, and I accept that, but that's not the test. The test is, is there any other basis in reality for the excuse. It's a close question in my mind, here, but I'm satisfied that there exists a valid basis for the excusal. So the motion both under *Wheeler* and for a mistrial is denied.

After jury selection was complete, defense counsel asked for reconsideration of the *Wheeler* motion, noting that Juror No. 1 was a 22–year–old female and had a family member who had been convicted of a crime. The prosecutor did not respond and the trial judge denied the motion. Mitleider was found guilty on all charges.

## II.

■ All the defendants appealed to the California Court of Appeal. On September 14, 1999, in an unpublished opinion, the Court of Appeal, Fourth Appellate District, affirmed Mitleider's conviction.[3] The court rejected the defendants' *Wheeler* claims, explaining:

On appeal, the defendants contend the trial court erred in denying their *Wheeler* motions. *Wheeler* holds that a party may not use peremptory challenges to remove prospective jurors solely based on race. (*People v. Wheeler, supra,* 22 Cal.3d at p. 276, 148 Cal.Rptr. 890, 583 P.2d 748; *People v. Fuentes* (1991) 54 Cal.3d 707, 713, 286 Cal.Rptr. 792, 818 P.2d 75.) A party who believes that an opponent is improperly using peremptory challenges for a discriminatory pur-

pose must make a timely objection and a prima facie showing that the jurors are being excluded on the basis of group bias. (*People v. Fuentes, supra,* 54 Cal.3d at p. 714, 286 Cal.Rptr. 792, 818 P.2d 75.) Once the moving party establishes a prima facie case, the burden shifts to the other party to come forward with a group-neutral explanation for the exercise of the challenges. (*Ibid.*)

In this case, the trial court asked the prosecutor to explain his reasons for the exercise of peremptory challenges to the four Black prospective jurors, thus making an implied finding that the defendants had established a prima facie case of discrimination. (*People v. Fuentes, supra,* 54 Cal.3d at p. 716, 286 Cal.Rptr. 792, 818 P.2d 75.) It then considered the prosecution's proffered reasons for his use of the peremptory challenges, which were facially race-neutral and directed toward perceived individual biases rather than group bias, and determined that those reasons were valid.

A trial court's ruling on a *Wheeler* motion is entitled to "great deference" unless the reviewing court concludes that the proffered explanation is inherently implausible in light of the whole record. [Citations omitted.] However, the defendants argue that the trial court did not make " 'a sincere and reasoned attempt to evaluate the prosecutor's explanation in light of the circumstances of the case as then known,' " before determining that the justifications were bona fide. [Citations omitted.] Mitleider also argues that the court misunderstood the applicable standard in determining whether the proffered reasons

---

**3.** The court determined, however, that Mitleider should be resentenced and granted partial relief to other defendants.

were valid and thus its determination should not be accorded any deference. We agree that the trial court's statement of the appropriate standard was perhaps ineloquent, but conclude from the record that the court determined that there was no racial basis for the exclusions and that the exclusions had a "basis in reality" other than group bias. The record therefore fails to support the defendants' claim of *Wheeler* error.

Mitleider's petition for review with the California Supreme Court and petition for certiorari with the United States Supreme Court were denied.

### III.

■ In April 2002, Mitleider filed a habeas petition in the United States District Court for the Southern District of California, raising several issues, including his *Batson* claim. The district court denied the petition. Addressing the *Batson* claim, the district judge held:

> [D]espite Petitioner's strained interpretations to the contrary, the jury selection in this case passed muster under the Supreme Court standard articulated in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The justifications offered by the prosecutor for the peremptory challenges were adequately race neutral. The prosecutor properly evaluated each juror's life experience and exposure to the criminal justice system in determining their potential adequacy to sit on the jury. The prosecutor's challenges were based in fact, and not speculation. Moreover, the Court notes that a prosecutor's explanation need not rise to the level of exercise of a challenge for cause. *Batson*, 476 U.S. at 97, 106 S.Ct. 1712. Indeed, the

record shows that the trial judge carefully considered the credibility of the prosecutor and the justification he advanced for his peremptory strikes, taking the matter under submission, and conceding that while a "close question" was nonetheless sufficient under *Batson*. This Court agrees.

Mitleider filed a timely notice of appeal. After the district court denied his request for a Certificate of Appealability, 28 U.S.C. § 2253(c)(1), (3), we granted a Certificate of Appealability limited to whether Mitleider's rights under *Batson* were violated.[4]

### IV.

■ We review de novo a district court's denial of a petition under 28 U.S.C. § 2254. *Williams*, 354 F.3d at 1106; *Lewis v. Lewis*, 321 F.3d 824, 829 (9th Cir. 2003). Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), however, a federal court will grant habeas relief only if the state court decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2).

■■ This deferential standard requires us to presume that "state courts know and follow the law." *Lewis*, 321 F.3d at 829 (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002)). Moreover, state court factual findings are presumed correct in the absence of clear and convincing evidence to the contrary. *See Miller–El v. Cockrell*,

---

4. Our review of Mitleider's case is limited to the issues encompassed by the grant of the Certificate of Appealability. *Williams v.*

*Rhoades,* 354 F.3d 1101, 1106 (9th Cir.2004), *cert. denied,* —— U.S. ——, 125 S.Ct. 345, 160 L.Ed.2d 225 (2004).

537 U.S. 322, 340, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) ("Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2)."); *see also Penry v. Johnson,* 532 U.S. 782, 793, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001) ("[E]ven if the federal habeas court concludes that the state court decision applied clearly established federal law incorrectly, relief is appropriate only if that application is also objectively unreasonable.").

## V.

■ The state courts recognized that a *Batson* challenge is evaluated in three steps. First, a defendant must make a prima facie showing that the prosecutor exercised a peremptory challenge because of race. *Batson,* 476 U.S. at 96–97, 106 S.Ct. 1712. Second, if such a showing is made, the burden shifts to the prosecutor to come forward with a race-neutral explanation for the challenges. *Id.* at 97, 106 S.Ct. 1712. Here, the trial court found that the defendants made a prima facie showing and required that the prosecutor explain his reasons for the exercise of peremptory challenges to the African–American jurors. Mitleider does not contest that the trial court followed the first two steps of the *Batson* inquiry.

■ Mitleider, however, argues that the trial court did not comply with the third step of the inquiry. This step requires the trial court to determine "whether the op-

ponent of the strike has proved purposeful racial discrimination." *Purkett v. Elem,* 514 U.S. 765, 767, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995); *see also Hernandez v. New York,* 500 U.S. 352, 359, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991)("Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.").

■ In *Collins,* 365 F.3d at 679, we emphasized that a finding of discriminatory intent turns largely on the trial court's evaluation of the prosecutor's credibility because " '[t]he credibility of the prosecutor's explanation goes to the heart of the equal protection analysis,' *Hernandez,* 500 U.S. at 367, 111 S.Ct. 1859." In *Williams,* we explained:

> The trial court must not simply accept the proffered reasons at face value; it has a duty to "evaluate meaningfully the persuasiveness of the prosecutor's [race]-neutral explanation[ ]" to discern whether it is a mere pretext for discrimination. *United States v. Alanis,* 335 F.3d 965, 969 (9th Cir.2003).

354 F.3d at 1108. Thus, the trial court must evaluate the prosecutor's proffered reasons and credibility under "the totality of the relevant facts," using all the available tools including its own observations and the assistance of counsel.[5] *Lewis,* 321 F.3d at 831.

Here, the trial judge understood the nature of the third step of the *Batson* inquiry. After the prosecutor articulated his reasons for the challenges, the trial judge took a recess to evaluate the prosecutor's reasons and, recognizing that it was a close question, ruled that the prosecutor was credible and that "there exists a valid basis

---

**5.** We noted that a review of the record and a comparative analysis of a struck juror with an empaneled juror are tools " 'for exploring the possibility that facially race-neutral reasons are a pretext for discrimination.' " *Lewis,* 321 F.3d at 830–31 (quoting *Turner v. Marshall,* 121 F.3d 1248, 1251–52 (9th Cir.1997)).

for the excusal." In other words, the trial judge appreciated defense counsel's concerns, but determined that the prosecutor did not have a discriminatory intent in making the challenges.

Mitleider objected that "a valid basis for the excusal" was not necessarily the same as a determination that the prosecutor's subjective reasons for the challenges were not discriminatory. Mitleider made this argument in his appeal to the California Court of Appeal. That court considered Mitleider's argument, reviewed the record, and determined that despite the trial judge's choice of words, "there was no racial basis for the exclusions and that the exclusions had a 'basis in reality' other than group bias." Thus, the state courts properly focused on the prosecutor's actual intent. The record does not support a conclusion that the state courts failed to apply clearly established federal law.

## VI.

There remains Mitleider's contention that the state courts' decisions were "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings." 28 U.S.C. § 2254(d)(2). Mitleider argues that the removal of the four African–American jurors who were seated in the jury box creates an inference of discrimination. The applicable standard, however, is not an inference of discrimination. The inference of racial motivation is what a defendant must show to meet the first step of

the *Batson* standard.[6] The second and third steps of the *Batson* standard concern whether the inference is correct—whether the recusal was based on a discriminatory motive. Although the inference remains immutable, the courts may determine that the inference does not reflect reality.[7]

Mitleider also argues that an examination of the prosecutor's given reasons indicates that the prosecutor's reasons were pretextual and that the challenges were really racially motivated. The state courts disagreed with Mitleider, and on this record, we cannot say that the state courts' determinations were unreasonable.

The prosecutor articulated facially reasonable race-neutral grounds for each of the challenges. His challenge of Mr. D. was based on Mr. D.'s indication that he had a brother who had been convicted of possession of cocaine, and his ambiguous response on the juror questionnaire that "[r]ape charges were filed against a teacher's aide and lack of evidence, the case was dismissed." Miss W. was recused because in the prosecutor's opinion she indicated that she did not want to serve on the jury. Miss F. was challenged because she did not candidly explain why her brother had a "probation problem," or why he was on felony probation in the first place. Miss B. was young, had little life experience, was late to court and less than forthcoming in her admission that she had quit school and work.

Defense counsel, although given an opportunity to do so by the trial judge, of-

---

6. *See Batson,* 476 U.S. at 93–94, 106 S.Ct. 1712 ("[W]e have recognized that a black defendant alleging that members of his race have been impermissibly excluded from the venire may make out a prima facie case of purposeful discrimination by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.").

7. In *Hernandez,* the Supreme Court noted "[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." 500 U.S. at 359, 111 S.Ct. 1859.

fered no rebuttal to the prosecutor's explanations for his challenges to Mr. D., Miss W. or Miss F.[8] Counsel did argue that although Miss B. was young and was late to court, she was legally eligible to be a juror and there may have been good reasons for her tardiness, which the prosecutor failed to explore.[9]

The test under *Batson*, however, is not that the prosecutor's reason is persuasive, but that it does not deny equal protection. *Purkett*, 514 U.S. at 769, 115 S.Ct. 1769.[10] Accordingly, the prosecutor's belief that Miss B.'s tardiness was a sign of immaturity is a legitimate reason for his challenge, even if mistaken, as long as the reason is not pretextual. Similarly, the perceptions that Miss W. did not want to be on the jury, that Miss F. was less than forthright about her brother's involvement with the criminal justice system, and that Mr. D. had limited life experiences are all permissible reasons for peremptory challenges, unless Mitleider carries his burden of showing that they were pretextual. We have reviewed the record and Mitleider's presentation and conclude that he has not demonstrated that it was unreasonable for the trial judge to find the prosecutor credible.

8. On appeal, Mitleider argues that the prosecutor's incorrect statement that Mr. D. was reluctant to serve, and contention that Mr. D. had "limited life experience," constitute strong evidence of an improper racial motivation. It is true that the prosecutor erred in recalling that Mr. D. had been reluctant to serve. Our review of the record, however, suggests that it was reasonable to find Mr. D.'s answers to the juror questionnaire troubling and to conceive of Mr. D. as having been somewhat sheltered.

9. After jury selection was complete, defense counsel asked for reconsideration of defendants' *Batson* motion noting that Juror No. 1 was twenty-two years old and had a family member who had been arrested. The trial judge denied the motion for reconsideration. A review of the record indicates that Juror No. 1 was very different from Miss B. Although she was only a year older than Miss B., Juror No. 1 had a son, had been employed as a collections specialist for over two years, was engaged to a deputy sheriff, and had taken the semester off from school to plan their wedding. Moreover, Juror No. 1 indicated that although she knew her older sister had been arrested when Juror No. 1 was twelve or thirteen, the incident was never discussed in the family and Juror No. 1 did not know why her sister had been arrested or the outcome. Accordingly, the prosecutor's failure to challenge Juror No. 1 did not undermine his stated reasons for challenging Miss B.

10. The Supreme Court explained:

The prosecutor's proffered explanation in this case—that he struck juror number 22 because he had long, unkempt hair, a mustache, and a beard-is race neutral and satisfies the prosecution's step two burden of articulating a nondiscriminatory reason for the strike. "The wearing of beards is not a characteristic that is peculiar to any race." *EEOC v. Greyhound Lines, Inc.*, 635 F.2d 188, 190, n. 3 (C.A.3 1980). And neither is the growing of long, unkempt hair. Thus, the inquiry properly proceeded to step three, where the state court found that the prosecutor was not motivated by discriminatory intent.

In habeas proceedings in federal courts, the factual findings of state courts are presumed to be correct, and may be set aside, absent procedural error, only if they are "not fairly supported by the record." 28 U.S.C. § 2254(d)(8). See *Marshall v. Lonberger*, 459 U.S. 422, 432, 103 S.Ct. 843, 849, 74 L.Ed.2d 646 (1983). Here the Court of Appeals did not conclude or even attempt to conclude that the state court's finding of no racial motive was not fairly supported by the record. For its whole focus was upon the *reasonableness* of the asserted nonracial motive (which it thought required by step two) rather than the *genuineness* of the motive. It gave no proper basis for overturning the state court's finding of no racial motive, a finding which turned primarily on an assessment of credibility, see *Batson*, 476 U.S. at 98, n. 21, 106 S.Ct., at 1724, n. 21. Cf. *Marshall, supra*, at 434, 103 S.Ct., at 850.

*Purkett*, 514 U.S. at 769, 115 S.Ct. 1769.

Mitleider argues that this court has granted relief under *Batson* where there was significantly less evidence of systematic group exclusion. The prosecutor's motives, however, must be considered on the basis of the facts set forth in each particular case. The facts in this case are distinguishable from the facts presented in the Ninth Circuit cases cited by Mitleider. In *United States v. Chinchilla*, 874 F.2d 695, 698–99 (9th Cir.1989), the prosecutor struck a Hispanic juror because of where he lived and his type of employment, and struck a Hispanic alternate juror because of his age and his appearance. On direct appeal, we reversed, holding that the prosecutor had failed to meet the second step of the *Batson* standard because his explanations were not sufficiently "clear and reasonably specific." *Id.* at 698. Here, the prosecutor offered specific reasons for his challenges and the California Court of Appeal found that the prosecutor's proffered reasons and actual motives for challenging the jurors were race-neutral. These factual findings by the state court are presumed correct absent clear and convincing evidence to the contrary. *Miller-El*, 537 U.S. at 340, 123 S.Ct. 1029.

In *McClain v. Prunty*, 217 F.3d 1209, 1224 (9th Cir.2000), we granted relief in a habeas appeal because the prosecutor's reasons for excusing two African–American jurors were determined to be pretextual.[11] By contrast, here the prosecutor's stated race-neutral reasons appear to have been reasonably based on the jurors' written responses, comments and actions. Mitleider has offered nothing, other than the challenges themselves, to support his allegation that the prosecutor's reasons were pretextual. As noted, the one specific juror referenced by Mitleider for comparative analysis, Juror No. 1, was factually distinguishable.

The difference between *Lewis* and the case at bar is instructive as the cases are procedurally similar. In *Lewis*, we granted relief on a habeas appeal from a state murder conviction on the ground that the trial court had failed to properly perform step three of the *Batson* standard. 321 F.3d at 832. We held that the trial court's conclusion, reached after having rejected an unspecified number of the prosecutor's reasons, that one of the prosecutor's reasons was "probably ... reasonable" was inadequate. *Id.*[12] Here, however, we find that the state appellate court reasonably determined that the trial court properly undertook the third step in the *Batson* standard, and that, despite the trial court's ineloquence, the prosecutor's motives were not race related.

In *Collins*, we granted relief in a habeas appeal from a state drug conviction. We determined that the prosecutor's stated reasons of age and demeanor for striking two African–American jurors were not supported by the record and hence were

---

**11.** The court found that for the first juror, the prosecutor "first justified striking [her] from the jury by attributing to[her] beliefs that she did not hold," and then justified the strike by speculating "that because [she] was heavyset, she must have lied about being a stewardess." *McClain*, 217 F.3d at 1221. Furthermore, the prosecutor's claim that she lacked decision-making experience was revealed to be pretextual through comparative analysis to another juror. *Id.* The court found the prosecutor's reasons for recusing the second juror to be

"objectively contrary to the facts." *Id.* at 1222.

**12.** Unlike the facts in the present case, in *Lewis*, the presence of a racial motive was inherent in the prosecutor's statement:

Additionally, because, tell you the truth, because she's African American, and I was unsure who she was, I watched her relatively closely from the moment she came in the courtroom.

321 F.3d at 828.

pretextual and that the state appellate court, by failing to scrutinize the record, had misapplied federal law. 365 F.3d at 686–87. In our case, the prosecutor's challenges did not rest on speculative reasons, the State rebutted Mitleider's comparative analysis to other jurors, and the state appellate court properly reviewed the record for compliance with *Batson.*

Finally, Mitleider's reliance on *United States v. Alanis,* 335 F.3d 965 (9th Cir. 2003), is of no avail. There the district court judge summarily denied the defendant's *Batson* motion, stating that the prosecutor had offered a "plausible explanation" for his challenges. *Id.* at 969. On direct appeal, we held that the trial court erred "by failing to proceed to step three to evaluate meaningfully the persuasiveness of the prosecutor's gender-neutral explanations." *Id.* Here, (1) the trial judge took a recess before ruling on the adequacy of the prosecutor's reasons; (2) the trial judge, while recognizing the closeness of the issue, determined that the prosecutor was credible and had valid reasons for the recusals; and (3) the California Court of Appeal affirmed that the prosecutor was credible and his reasons were race-neutral. As noted, the findings by the state court are presumed correct absent clear and convincing evidence to the contrary. *Miller–El,* 537 U.S. at 340, 123 S.Ct. 1029.

## VII.

Despite the inference raised by the prosecutor's peremptory strikes of the four African–American jurors that were seated in the jury box, the record shows that the trial judge followed the three steps for considering a *Batson* challenge and found that the prosecutor had valid race-neutral reasons for challenging the jurors. The California Court of Appeal then carefully reviewed the record under the appropriate standard, rejected Mitleider's objection that the trial court had failed to determine the prosecutor's subjective motivation, and affirmed the trial court's determination that the prosecutor's reasons for challenging the jurors were race-neutral. As this is a habeas appeal subject to the AEDPA, relief is dependant upon a showing of either a violation of clearly established federal law or an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(1)(2). Mitleider has not demonstrated that the state courts violated clearly established federal law, and has failed to overcome the presumption that the state courts' findings are correct. Accordingly, the district court's denial of the habeas petition is

**AFFIRMED.**